J-S13022-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DESSIE LEWIS SEATON | |
| Appellant | No. 922 WDA 2014 |

Appeal from the Judgment of Sentence May 8, 2014
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-25-CR-0002538-2013

BEFORE:  BENDER, P.J.E., MUNDY, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                    **FILED JUNE 22, 2015**

Appellant, Dessie Lewis Seaton, appeals from the May 8, 2014 aggregate judgment of sentence of five to 12 years' incarceration, imposed following his conviction by a jury of possession with intent to deliver a controlled substance (heroin), possession of drug paraphernalia, and criminal conspiracy.[1]  After careful review, we affirm Appellant's convictions based on the comprehensive and well-supported opinion of Judge John J. Trucilla.  However, because of our *sua sponte* review of the legality of Appellant's sentence, we are constrained to vacate his sentence and remand for resentencing.

_____

[1] 35 P.S. §§ 780-113(a)(30), 780-113(a)(16), and 18 Pa.C.S.A. § 903(c), respectively.

In its August 1, 2014 opinion, the trial court has provided a thorough summary of the factual and procedural history of this case, which we need not fully reiterate here. Of import to the instant appeal, we note, in a separate case at CP-25-CR-0003652-2012, Appellant and others were charged on November 9, 2012, with PWID, conspiracy and related offenses in connection with a search of a vehicle wherein 49.9 grams of heroin was seized. Appellant was convicted of those charges on May 23, 2013, and sentenced on July 19, 2013.[2] Further investigation by the police of the wider activities of Appellant and others led the police to execute a search warrant on November 9, 2012, for an apartment at 1696 Treetop Drive in Millcreek Township. From the apartment, police seized 69.1 grams of heroin.

In connection with that contraband, Appellant was subsequently charged in the instant case with the aforesaid crimes on September 25, 2013. Immediately prior to trial, Appellant made an oral motion for dismissal on double jeopardy and compulsory joinder grounds, averring the instant charges were the same, or were derived from the same criminal episode, as those for which he was sentenced on July 19, 2013. The trial court denied the motion and Appellant proceeded to a jury trial, commencing

_____

[2] Appellant's appeal from that sentence was dismissed for failure to file a brief, but the trial court reinstated his appeal rights. *See Commonwealth v. Seaton*, --- A.3d ---, 1238 WDA 2014, (unpublished memorandum at 3, n.2). Appellant's conviction was affirmed but his sentence vacated on the same grounds we develop herein. *Id.* at 10.

on March 10, 2014. On March 11, 2014, the jury convicted Appellant on all counts. The trial court sentenced Appellant on May 8, 2014.[3] Appellant filed a timely notice of appeal on June 4, 2014.[4]

On appeal, Appellant raises a single issue for our review.

> Did the Commonwealth's prosecution of this case constitute a violation of the double jeopardy rule when the police charged [Appellant] with a drug charge on the same date that they obtained a search warrant for this case?

Appellant's Brief at 1.

Appellant contends a violation of his constitutional and statutory rights against double jeopardy resulted from the instant prosecution because, "the charges were the same in both of [his] case[s, and] that the police have a duty to find all the evidence against a person prior to charging that person." *Id.* at 4. Appellant essentially argues that his possession of the 49.9 grams of heroin seized from the vehicle and his

---

[3] On May 16, 2014, Appellant filed a *pro se* motion for reconsideration of sentence which the clerk of courts forwarded to counsel per Pennsylvania Rule of Criminal Procedure 576(a)(4) on May 19, 2014. No counselled motion was filed.

[4] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

possession of 69.1 grams of heroin seized from the apartment stemmed from a single criminal act or episode.[5] *Id.* at 4-5.

The following principles guide our review of these issues. "It is well-settled that [a]n appeal grounded in double jeopardy raises a question of constitutional law. This [C]ourt's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo* …." ***Commonwealth v. Martin***, 97 A.3d 363, 364 (Pa. Super. 2014) (internal quotation marks and citation omitted).

_____

[5] In his Rule 1925(b) statement, Appellant asserted error based on State and Federal constitutional double jeopardy grounds as well as grounds based on 18 Pa.C.S.A. §§ 109 and 110. Appellant's Concise Statement of Errors Complained of on Appeal, 6/20/14, at 2. In his appellate brief, however, Appellant does not advance any argument relative to Section 110. **See** Appellant's Brief. Accordingly, this basis for Appellant's claim is waived. **See generally** Pa.R.A.P. 2116, 2119(a). The trial court has included a discussion of this issue in its Rule 1925(a) opinion, which we adopt, so we include our standard of review for context and completeness.

Additionally, we note that Appellant's remaining issues on appeal could be found waived for failure to sufficiently argue his positions in his appellate brief. Relative to these issues, beyond citation to basic double jeopardy principles, Appellant includes no development of the facts of this case as they apply to his claim of error or other citations to authority. **See** Appellant's Brief at 3-4. Our Supreme Court held such briefing deficiencies may result in waiver of an issue on appeal. **See Commonwealth v. Johnson**, 985 A.2d 915, 924 (Pa. 2009) (stating, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived"), *cert. denied*, **Johnson v. Pennsylvania**, 562 U.S. 906 (2010). As noted above, however, the trial court has adequately addressed the merits of Appellant's issues on appeal, and we adopt the trial court's reasons as our own for purposes of our disposition.

> The double jeopardy protections afforded by the United States and Pennsylvania Constitutions are coextensive and prohibit successive prosecutions and multiple punishments for the same offense. The prohibition against double jeopardy protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. … The constitutional prohibition of double jeopardy also protects the convicted defendant from multiple prosecutions for the same offense, requiring a "single criminal episode" analysis.

*Commonwealth v. Miskovitch*, 64 A.3d 672, 685-686 (Pa. Super. 2013),

*quoting* *Commonwealth v. States*, 891 A.2d 737, 741–42 (Pa. Super.

2005) (internal citations omitted), *appeal denied*, 78 A.3d 1090 (Pa. 2014).

> The language of [18 Pa.C.S.A. §] 109 is plain and unambiguous: when a prosecution is for a violation of the same provision of the statutes and is based upon the same facts as the former prosecution, it is barred by such former prosecution. Because the introductory paragraph to [S]ection 109 uses the word "and," [S]ection 109 applies when subsequent charges are for a violation of the same provision of the statutes and are based on the same facts as the former charges.

*Commonwealth v. Schmidt*, 919 A.2d 241, 250 (Pa. Super. 2007)

(internal quotation marks and citations omitted), *appeal denied*, 936 A.2d 40

(Pa. 2007). Additionally, "[o]ur standard of review of issues concerning [18

Pa.C.S.A. §] 110 is plenary." *Commonwealth v. George*, 38 A.3d 893,

896 (Pa. Super. 2012) (citation omitted). "The compulsory joinder statute[,

Section 110,] is a legislative mandate that a subsequent prosecution for a

violation of a provision of a statute that is different from a former

prosecution, or is based on different facts, will be barred in certain circumstances." ***Commonwealth v. Fithian***, 961 A.2d 66, 71 (Pa. 2008).

> The compulsory joinder rule bars a subsequent prosecution if each prong of the following test is met: (1) the former prosecution resulted in an acquittal or conviction; (2) the current prosecution was based on the same criminal conduct or arose from the same criminal episode; (3) the prosecutor in the subsequent trial was aware of the charges before the first trial; and (4) all charges were within the same judicial district as the former prosecution.

***Commonwealth v. Nolan***, 855 A.2d 834, 839 (Pa. 2004) (footnote and citations omitted)

> [S]ection 110 and constitutional double jeopardy protection are not co-extensive. While many of the same policies underlie the statutory and constitution provisions, they are not identical. In some ways Section 110 offers broader protection against a successive prosecution than does double jeopardy. For instance double jeopardy acts to prevent successive prosecutions for the "same offense" while section 110 extends protection to the "same criminal episode." In defining what constitutes the same criminal offense for double jeopardy purposes, the United States Supreme Court has declined to find that offenses are the same and thereby barred by double jeopardy merely because they are part of the same criminal episode. In contrast section 110(i)(ii) bars a subsequent prosecution if it is based on the same criminal episode as the former prosecution. … [O]ffenses which are part of the same criminal episode, must be logically related temporarily and physically, share common issues of fact or involve offenses which are necessary steps to the completion of others or even which involve attempts to conceal previous offenses. Thus, the same criminal episode may include offenses which constitute a continuing criminal scheme although they involve different statutory elements such that each charge requires

proof of a fact the other does not. Under section 110 subsequent prosecution involving the "same criminal episode" would be barred. In contrast, under the double jeopardy clause offenses stemming from the same criminal episode would be barred only if the prosecution needed to establish conduct in the subsequent prosecution which had already formed the basis of the prior prosecution.

*Commonwealth v. Bellezza*, 603 A.2d 1031, 1038 (Pa. Super. 1992)

(citations omitted).

[Relative to the "same criminal conduct/episode" prong, our Supreme Court] instructed courts considering the ["same criminal conduct/episode"] prong to look at the "temporal" and "logical" relationship between the charges to determine whether they arose from a "single criminal episode." …

Generally, charges against a defendant are clearly related in time and require little analysis to determine that a single criminal episode exists. However, in defining what acts constitute a single criminal episode, not only is the temporal sequence of events important, but also the logical relationship between the acts must be considered.

With regard to the logical relationship, [our Supreme Court] noted:

In ascertaining whether a number of statutory offenses are "logically related" to one another, the court should initially inquire as to whether there is a substantial duplication of factual, and/or legal issues presented by the offenses. If there is duplication, then the offenses are logically related and must be prosecuted at one trial. The mere fact that the additional statutory offenses involve additional issues of law or fact is not sufficient to create a separate criminal episode since the logical relationship test does not require "an absolute identity of factual backgrounds."

…

      [I]n determining if the "logical relationship" prong of the test has been met, we must ... be aware that a mere *de minimis* duplication of factual and legal issues is insufficient to establish a logical relationship between offenses. Rather[,] what is required is a substantial duplication of issues of law and fact.

…

In our consideration of the temporal and logical relationship between the criminal acts, we are guided by the policy considerations that § 110 was designed to serve:

(1) to protect a person accused of crimes from governmental harassment of being forced to undergo successive trials for offenses stemming from the same criminal episode; and (2) as a matter of judicial administration and economy, to assure finality without unduly burdening the judicial process by repetitious litigation.

…

 [T]he "same criminal episode" analysis cannot be made by merely cataloguing simple factual similarities or differences between the various offenses with which the defendant was charged[,] even if the offenses at issue constitute an enterprise. A proper analysis requires courts to determine whether there is a substantial duplication of issues of fact and law.

*Commonwealth v. Reid*, 77 A.3d 579, 582-583, 586 (Pa. 2013) (internal

quotation marks, citations, and footnote omitted). "Consideration of the

constitutional protections contained in the double jeopardy clauses is

necessary where the statutory provisions relating to subsequent prosecutions are not applicable." **Schmidt**, **supra** at 250 (citation omitted).

We have carefully reviewed the record and conclude that the trial court's August 1, 2014 Rule 1925(a) opinion fully sets forth Appellant's claims, identifies the proper standard of review, discusses the relevant law, analyzes the evidence adduced at trial, and explains the basis for its conclusion that Appellant's double jeopardy and compulsory joinder claims are without merit. We conclude that the thorough and well-reasoned opinion of Judge John J. Trucilla is in agreement with our own views. Specifically, we agree that offenses, although brought under identical statutory provisions, stemmed from discrete criminal episodes, being both logically and temporally distinct. **See Reid**, **supra**. Additionally, we agree with Judge Trucilla that the Commonwealth was not aware of Appellant's involvement with the contraband in the instant case prior to his first conviction. **See Nolan**, **supra**. Based on the foregoing, we conclude the trial court did not err in denying Appellant's oral motion to dismiss and affirm the jury verdict in this case. In so holding, we adopt Judge Trucilla's August 1, 2014 opinion as our own for purposes of disposition of Appellant's statutory and constitutional double jeopardy claims.

Notwithstanding our disposition of Appellant's issues on appeal, we are constrained to address a legality of sentencing issue *sua sponte*. "[A] challenge to the legality of the sentence can never be waived and may be

raised by this Court *sua sponte."* **Commonwealth v. Wolfe**, 106 A.3d 800, 801 (Pa. Super. 2014). As noted above, the trial court imposed a mandatory minimum sentence of five years' incarceration based on the weight of the heroin possessed pursuant to 18 Pa.C.S.A. § 7508(a)(7)(ii).[6]

_____

[6] The statute provides as follows.

> **§ 7508. Drug trafficking sentencing and penalties**
>
> **(a) General rule.--**Notwithstanding any other provisions of this or any other act to the contrary, the following provisions shall apply:
>
> …
>
> > (7) A person who is convicted of violating section 13(a)(14), (30) or (37) of The Controlled Substance, Drug, Device and Cosmetic Act where the controlled substance or a mixture containing it is heroin shall, upon conviction, be sentenced as set forth in this paragraph:
> >
> > …
> >
> > > (ii) when the aggregate weight of the compound or mixture containing the heroin involved is at least 5.0 grams but less than 50 grams: a mandatory minimum term of three years in prison and a fine of $15,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: a mandatory minimum term of five years in prison and

*(Footnote Continued Next Page)*

In light of recent precedent interpreting the import of the United States Supreme Court's ruling in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), we conclude the trial court imposed an illegal sentence. *See generally Commonwealth v. Newman*, 99 A.3d 86, 89 (Pa. Super. 2014) (*en banc*); *Commonwealth v. Fennell*, 105 A.3d 13 (Pa. Super. 2014); *Commonwealth v. Valentine*, 101 A.3d 801 (Pa. Super. 2014).

> [I]ssues pertaining to *Alleyne* go directly to the legality of the sentence. [] A challenge to the legality of a sentence … may be entertained as long as the reviewing court has jurisdiction. [] [I]f no statutory authorization exists for a particular sentence, that sentence is illegal and subject to

*(Footnote Continued)* ————————

> $30,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity;

> …

> **(b) Proof of sentencing.--**Provisions of this section shall not be an element of the crime. Notice of the applicability of this section to the defendant shall not be required prior to conviction, but reasonable notice of the Commonwealth's intention to proceed under this section shall be provided after conviction and before sentencing. The applicability of this section shall be determined at sentencing. The court shall consider evidence presented at trial, shall afford the Commonwealth and the defendant an opportunity to present necessary additional evidence and shall determine, by a preponderance of the evidence, if this section is applicable.

> …

18 Pa.C.S.A. § 7508.

- 11 -

> correction. An illegal sentence must be vacated. Issues relating to the legality of a sentence are questions of law[.] … Our standard of review over such questions is *de novo* and our scope of review is plenary.

*Fennell*, *supra* at 15 (internal quotation marks and citations omitted).

The *Newman* and *Valentine* panels concluded that unconstitutional portions of the similarly structured mandatory sentencing statutes at 42 Pa.C.S.A. §§ 9712, 9712.1, and 9713 were "essentially and inseparably connected," rendering the statutes unconstitutional in their entirety. *Newman*, *supra* at 101; *Valentine*, *supra* at 811. "Moreover, *Newman* makes clear that 'it is manifestly the province of the General Assembly to determine what new procedures must be created in order to impose mandatory minimum sentences in Pennsylvania following *Alleyne*.'" *Valentine*, *supra* at 812, *quoting Newman*, *supra* at 102.

In *Fennell*, this Court, following the reasoning set forth in *Newman* and *Valentine*, found section 7508 to be facially unconstitutional and mandatory sentences imposed thereunder to be illegal even where the fact triggering the imposition of the mandatory minimum, to wit the weight of the drugs possessed by the defendant, was, as was the case here, stipulated to at trial. *Fennell*, *supra* at 20; *accord Commonwealth v. Vargas*, 108 A.3d 858, 876 (Pa. Super. 2014) (*en banc*). Accordingly, we are constrained to vacate the May 8, 2014 judgment of sentence and remand for resentencing in accordance with this memorandum.

- 12 -

In sum, we conclude the trial court committed no error in denying Appellant's oral motion for dismissal based on constitutional and statutory double jeopardy grounds. Accordingly, we affirm appellant's conviction. However, we vacate the May 8, 2014 judgment of sentence as illegal, and remand for resentencing, without consideration of the mandatory minimum, consistent with this memorandum.

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2015

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: OF ERIE COUNTY PENNSYLVANI
v. : CRIMINAL DIVISION
:
DESSIE L. SEATON : No. 2538 – 2013

## MEMORANDUM OPINION

**August 1, 2014:** This matter is before the Court upon Dessie L. Seaton's (Appellant's)
appeal of his judgment of sentence. Appellant was ordered to file a Concise Statement of Errors
Complained of on Appeal, in accordance with Pa.R.A.P. 1925(b). Appellant complied and filed
his timely statement on June 20, 2014. In his sole issue raised on appeal, Appellant claims the
prosecution of the charges in the instant case violated the compulsory joinder rule and placed
him in double jeopardy due to his previous conviction at Criminal Docket 3652 of 2012.
(Appellant's Statement of Matters Complained of on Appeal at ¶ 5). This opinion, pursuant to
Pa.R.A.P. 1925(a), demonstrates that Mr. Seaton's appeal should be dismissed.

## FACTUAL AND PROCEDURAL HISTORY

A.     Procedural History

1. Criminal Docket Number 3652 of 2012

Following a search of a vehicle in which Appellant was present, 49.9 grams of heroin
was seized. Appellant and two others were arrested on November 9, 2012, and Appellant was
subsequently charged with Possession with Intent to Distribute, Possession, and Criminal
Conspiracy to distribute heroin (49.9 grams).[1] A three-day jury trial was held before the
Honorable John Garhart commencing May 20, 2013. On May 23, 2013, the jury returned a
verdict of guilty on all counts. On July 19, 2013, Judge Garhart sentenced Appellant to three to

---

[1] In violation of 35 P.S. § 780-113(a)(30), 35 P.S. § 780-113(a)(16), and 18 Pa.C.S. § 903(c).

1

ten years of incarceration on the charge of Possession with Intent to Distribute, and a concurrent term of two to ten years of incarceration on the charge of Conspiracy.[2] Appellant appealed on July 31, 2013. On July 3, 2014, the Superior Court dismissed the appeal due to Appellant's failure to file a brief. Currently, there is a pending motion to reinstate Appellant's right to appeal *nunc pro tunc* before Judge Garhart.

### 2. Criminal Docket Number 2538 of 2013

On September 25, 2013, Appellant was charged by criminal information with violations of Criminal Conspiracy to Possess with Intent to Deliver Heroin (69.1 grams), Possession with Intent to Deliver Heroin (69.1 grams), Possession and Possession of Drug Paraphernalia.[3] These charges stemmed from a search warrant issued November 9, 2012 to search an apartment located at 1696 Treetop Drive, Apartment 14B, Millcreek Township, Pennsylvania (hereinafter "the Granada Apartment"). This search warrant followed Appellant's arrest in connection with the charges at Docket 3652 of 2012.

A jury trial was scheduled for March 10, 2014. Previous to the selection of jurors, Appellant presented the Court with an oral Motion to Dismiss. Appellant claimed the instant prosecution, premised on the seizure of 69.1 grams of heroin and assorted drug paraphernalia, constituted double jeopardy and violated his constitutional protections.[4] Following argument from counsel, the Court subsequently denied Appellant's motion on the basis, *inter alia*, that he was charged for "two separate, isolated incidents and arguably separate conspiracies as well." (Notes of Testimony "N.T." March 10, 2014 at 12).

---

[2] The penalty for Possession merged with Possession with Intent to Distribute for sentencing purposes.
[3] In violation of 18 Pa.C.S. § 903(c), 35 P.S. § 780-113(a)(30), 35 P.S. § 780-113(a)(16), and 35 P.S. § 780-113(a)(32), respectively.
[4] Contravening the Double Jeopardy clauses of the United States and Pennsylvania Constitutions. *See* U.S. Const. Amend. V; Pa. Const. Art. I, § 10.

The case proceeded to a two-day jury trial. On March 11, 2014, the jury returned a verdict of guilty on all counts. On May 8, 2014, Appellant was sentenced as follows:

Count One (Possession with Intent to Deliver): Incarceration for a mandatory minimum period of five years to a maximum period of twelve years, consecutive to Docket 3652 of 2012, plus fines and costs.

Count Two (Criminal Conspiracy): Incarceration for a minimum period of three and a half years to a maximum period of seven years, concurrent to count one, plus costs.

Count Three (Possession): Merged with Count One.

Count Four (Possession of Drug Paraphernalia): Incarceration for a minimum period of three months to a maximum period of twelve months, concurrent to count one, plus costs.

Consequently, Appellant was sentenced to an aggregate term of incarceration of five to twelve years. Appellant's sentence is consecutive to the aggregate sentence of three to ten years at Docket 3652 of 2012.

On June 4, 2014, Appellant filed the instant notice of appeal. This Court subsequently ordered Appellant to file a Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). On June 20, 2014, Appellant filed a Statement of Matters Complained of on Appeal raising one issue for this Court's review.

B.      Factual History

1. Criminal Docket Number 3652 of 2012 (49.9 grams of heroin)

At the trial commencing May 20, 2013, the Commonwealth presented the testimony of Jamal Hokes, Danny Keefer, Lieutenant Michael Nolan of the Erie Police Department, Detective

3

Jon Reddinger of the Erie County District Attorney's Office, and Detective Greg Acri of the Erie County District Attorney's Office.

The testimony from that trial established that on November 8, 2012, Jamal Hokes was contacted by R.J. Kemp to transport drugs from Detroit to Erie on behalf of Appellant. (*See* N.T. May 20, 2013 at 36-38). Mr. Hokes then went to R.J. Kemp's house in Detroit where Appellant personally delivered a Lorna Doone cookie box with 49.9 grams of heroin inside of it. (*Id.* at 38-40; *see also* N.T. May 21, 2013 at 18).

Mr. Hokes and Appellant subsequently travelled together from Detroit to Erie, arriving at the train station in Erie on November 9, 2012. (N.T. May 20, 2013 at 40-42). Appellant arranged for them to be picked up by Danny Keefer. (*Id.* at 42, 70-71). Awaiting Appellant's arrival were Lieutenant Nolan and Detective Reddinger, who were conducting surveillance of the area pursuant to a tip from a confidential informant. (*Id.* at 100-01; N.T. May 21, 2013 at 4-5). Mr. Keefer picked up Mr. Hokes and Appellant and subsequently stopped at the nearby Country Fair. (N.T. May 20, 2013 at 43, 73).

While at the Country Fair, Mr. Keefer's car was subject to an investigatory stop by Lieutenant Nolan and Detective Reddinger. (*Id.* at 105-06). After locating a small amount of heroin on the person of Mr. Keefer, Mr. Keefer told Lieutenant Nolan that Mr. Hokes and Appellant were his drug suppliers. (N.T. May 20, 2013 at 107). A drug dog was called in to detect any additional drugs. (N.T. May 21, 2013 at 7). The car was subsequently searched, and Detective Reddinger located a black suitcase and a blue duffel bag in the trunk. (*Id.*) Within the blue duffel bag, Detective Reddinger found the Lorna Doone cookie box, which contained 49.9 grams of heroin. (*Id.* at 8-9). Appellant was subsequently arrested.

4

2. Criminal Docket Number 2538 of 2013 (69.1 grams of heroin)

At the March 10, 2014 trial before this Court, the Commonwealth presented the testimony of Richard Kemp, Danny Keefer, Detective Adam Hardner of the Millcreek Police Department, Lieutenant Michael Dougan of the Millcreek Police Department, Detective Jon Reddinger of the Erie County District Attorney's Office, and Lieutenant Michael Nolan of the Erie Police Department. Collectively, they testified that a search of the Granada Apartment yielded 69.1 grams of heroin, two digital scales, and plastic baggies, indicating evidence of a drug operation. Further, the Commonwealth's witnesses disclosed that the heroin came from Detroit, Michigan and the Granada Apartment, rented in Mr. Keefer's name, was used as a holding location for the heroin.

The Commonwealth first called Richard Kemp, who was charged as a co-conspirator. Richard Kemp testified that he was originally from Detroit and had known Appellant for fifteen years. (N.T. Day One at 35-36). Richard Kemp testified that in March of 2012 he was recruited by Appellant to sell heroin in Erie, Pennsylvania. (*Id.* at 39-40). Mr. Kemp would travel by train to Erie to stay at the Granada Apartment a week at a time and sell heroin during the course of that week. (*Id.* at 40-41). Richard Kemp testified that only Appellant brought the heroin from Detroit to Erie and that it would be prepackaged upon his arrival. (*Id.* at 42). According to Richard Kemp's testimony, Appellant also recruited Richard Kemp's little brother, R.J. Kemp, and Jamal Hokes from Detroit to sell heroin in Erie. (*Id.* at 41). He indicated that once every three weeks, one of the three would travel from Detroit to Erie to sell heroin. (*Id.*). The heroin would be supplied by Appellant. (*Id.* at 40).

Beginning in July 2012, Mr. Kemp began selling heroin from the Granada Apartment. (*Id.* at 41-42). Mr. Kemp testified that Appellant arranged for Danny Keefer, a heroin addict

5

from Erie, to rent the apartment in exchange for heroin. (*Id.* at 43, 45). Mr. Keefer also acted as a runner for the group. (*Id.*). Mr. Keefer and another runner, not named, were the only individuals who would interact with potential buyers and would meet and sell heroin to them at a location other than the Granada Apartment. (*Id.* at 44-45). Appellant would provide Richard Kemp, R.J. Kemp and Jamal Hokes with heroin from Detroit. One of them would stay at the Granada Apartment in Erie for a week at a time and store the heroin there. They would further arrange to sell the heroin to their buyers and send Mr. Keefer or their other runner to complete the transaction and deliver the heroin at a location outside of the Granada Apartments. The Granada Apartment served as both a stash house for the heroin and a place for the revolving door of heroin dealers from Detroit to stay while selling heroin in Erie.

Richard Kemp provided further details of the conspiracy. He described Appellant as the "boss" who set up the rules for the criminal operation. (*Id.* at 50-51). Mr. Kemp testified that they sold the heroin for $200 per gram. (*Id.* at 48). Mr. Kemp would take his amount of the proceeds and give the rest to Appellant. (*Id.* at 49). Mr. Kemp claimed he would make between $1,500 and $3,000 a week and estimated Appellant's share as up to $15,000 a week. (*Id.* at 67).

Richard Kemp also testified to the events of October 28, 2012. Mr. Kemp arrived in Erie four to five days prior to October 28, 2012 to prepare for the first of the month, when many of their customers would receive checks. (*See id.* at 45-46). Appellant had provided Mr. Kemp with 100 grams of heroin to sell that he brought to Erie from Detroit. (*Id.* at 47). This heroin was brought to Erie from Detroit the last week of October 2012 and was different from the 49.9 grams of heroin in the Lorna Doone cookie box brought by Appellant and Jamal Hokes to Erie on November 9, 2012. (*See id.* at 46). As discussed *infra*, Appellant was prosecuted separately for this amount. Mr. Kemp testified that he only sold 15 or 20 grams of the 100 grams of heroin

6

because "one of the runners got picked up by the police" and "she was going to tell on everything." (*Id.* at 49). Therefore, fearing arrest, he left the Granada Apartment on October 28, 2012, leaving approximately 70 grams of heroin behind. (*Id.* at 49, 51). He left the heroin in a closet "on some clothes." (*Id.* at 49-50). He explained that he did not want to take the heroin with him because he feared he would owe Appellant the money for it if he did. (*Id.* at 50). This testimony also clearly established that the source of the 100 grams of heroin was completely separate and distinct from the 49.9 grams of heroin later found in the Lorna Doone cookie box.

Following Appellant's arrest, Mr. Kemp admitted to having called Appellant in prison to ascertain the name and contact information of Appellant's supplier in Detroit so as to continue their criminal operation. (*See id.* at 52-56, 68). Mr. Kemp called Appellant on November 12, 2012 and November 13, 2012 and the recordings of the phone calls were admitted into evidence as Commonwealth's Exhibits 1B and 1A, respectively. (*Id.* at 55-60).

The Commonwealth next called Danny Keefer. Mr. Keefer, a native of Erie, testified that he rented the Granada Apartment in his name from July to November of 2012 based on an agreement with Appellant that Appellant would provide him heroin in return. (*Id.* at 69-70). Mr. Keefer admitted that he is a heroin addict and claimed he wanted heroin "as much as possible." (*Id.* at 70-74). Consequently, he agreed to also act as a drug runner for Appellant in return for heroin. (*See id.* at 76). When a buyer would call Richard Kemp, R.J. Kemp or Jamal Hokes to ask for heroin, Mr. Keefer would deliver the heroin to the purchaser and return the money to whichever other coconspirator was staying at the Granada Apartment. (*Id.*) Mr. Keefer testified that the sole purpose of renting the Granada Apartment was to facilitate the sale of heroin in Erie. (*Id.* at 70). Mr. Keefer claimed he paid rent and utilities with money given to him by Appellant. (*Id.* at 71). He testified Appellant would come into town once every two to three weeks, and that

7

he would provide Appellant with transportation. (*Id.* at 71-73). Mr. Keefer testified that he would be present when Appellant would collect money from Richard Kemp, R.J. Kemp and Jamal Hokes. (*Id.* at 73). He claimed he was given information about the criminal operation on a "need to know" basis. (*Id.*).

The Commonwealth subsequently called Detective Adam Hardner of the Millcreek Police Department to testify. Detective Hardner has been an officer of the Millcreek Police Department for eight years and served with the Special Investigations Unit in Narcotics for the past two years. (*Id.* at 81-82). Detective Hardner testified that he executed a search warrant on the Granada Apartment on November 9, 2012. (*Id.* at 82). The apartment consisted of one bedroom, a kitchen, living room and bathroom. (*Id.* at 83). Detective Hardner testified that through his search he found fourteen plastic sandwich bags filled with heroin in the bedroom closet, a U.S. Balance digital scale in the kitchen cabinet, a A.W.S. 100 digital scale in a kitchen drawer, and plastic sandwich bags on the kitchen counter. (*Id.* at 84-89; *see also* Comm.'s Ex. 4-9). A stipulated lab report from the Pennsylvania State Police by Ted Williams shows that the 14 plastic bags contained a total of 69.1 grams of heroin. (*Id.* at 92; *see also* Comm.'s Ex. 11).

The Commonwealth next called Detective Jon Reddinger of the Erie County District Attorney's Office to testify. Detective Reddinger has served with the District Attorney's office for seven years and has been a police officer for fifteen years. (*Id.* at 104). Detective Reddinger recorded Appellant's telephone conversations while in prison. (*Id.*). Detective Reddinger identified a third recorded telephone call wherein Appellant stated "they hit Rich's apartment" and "Danny's told." (*See id.* at 104-107; *see also* Comm.'s Ex. 1C). These statements were admitted to establish Appellant's knowledge and insight regarding the conspiracy to sell heroin in Erie.

8

Next, the Commonwealth called Lieutenant Michael Dougan of the Millcreek Police Department. Lieutenant Dougan has served with the Millcreek Police Department for thirty-two years and is in charge of the evidence section within the investigative services division of the department. (*Id.* at 94). Lieutenant Dougan testified that part of his duties includes the recovery and documentation of latent fingerprint evidence at crimes scenes, which he has processed in close to 1,500 cases. (*Id.* at 95). Lieutenant Dougan testified that he processed the fingerprints lifted from the evidence recovered from the Grenada Apartment, totaling 29 items. (*Id.* at 96). Lieutenant Dougan testified that of the eight identifiable latent fingerprints, one was identified as a fingerprint of Jamal Hokes and the remainder were identified as fingerprints of Richard Kemp. (*Id.* at 99-100; *see also* Comm.'s Ex. 12). Lieutenant Dougan stated that none of the items has Appellant's fingerprints on them. (*Id.* at 100). Additionally, Lieutenant Dougan stated that they were unable to lift any fingerprints off the plastic bags containing heroin. (*Id.* at 100-01).

The Commonwealth finally called Lieutenant Michael Nolan of the Erie Police Department as an expert in the area of "narcotics trafficking and investigation." (*Id.* at 110). Lieutenant Nolan has served with the Erie Police Department for 22 years, has had extensive training in the area of narcotics, handled several hundred cases over the course of his career, been consulted as an expert in close to 200 narcotic cases, and testified in up to 150 such cases, many of these involving heroin. (*Id.* at 108-110). Lieutenant Nolan was, therefore, recognized as an expert in narcotics and drug investigations by this Court. (*Id.* at 110).

Lieutenant Nolan testified that the amount of heroin in question, 69.1 grams, was consistent with the charge of Possession with Intent to Deliver rather than mere possession. (*Id.* at 113). Lieutenant Nolan testified that a typical use dose of heroin is .05 grams and one gram of heroin is enough for 20 doses. (*Id.*) One dose is generally twenty dollars, qualifying heroin as

9

an expensive drug. (*Id.* at 113-114). Users and addicts will typically "use day-to-day and try to come up with a way to pay for the drug the following day." (*Id.* at 114). Lieutenant Nolan further testified that each of the fourteen bags at issue in this case contained 100 doses and would each cost $2,000. (*Id.* at 113-14). Consequently, it would be unusual for a user to have one bag of twenty doses, much less the fourteen bags found in the Granada Apartment. (*Id.* at 114). Lieutenant Nolan concluded that the amount of heroin packaged in each of the bags found at the Granada Apartment is consistent with a "high level dealer" selling to a "low level dealer." (*Id.*). Further, the plastic bags and scales found at the apartment were indicative of possession with intent to deliver because they are "very common tools of the trade" for drug dealers who deal in drugs by specific weight, such as grams. (*Id.* at 114-15). By contrast, addicts or users do not typically utilize digital scales. (*Id.*) Following Lieutenant Nolan's testimony, the Commonwealth rested its case. (*Id.* at 124).

Subsequently, the Court engaged in a colloquy with the Appellant as to his constitutional safeguards and right to remain silent. (*Id.* at 126-129). The Court then recessed until March 11, 2014 and gave Appellant time to decide whether he would testify. When the Court returned to session, the Court engaged in a second colloquy with Appellant and he notified the Court of his intention to offer testimony on his own behalf. (N.T. Day Two at 3-7). The Court concluded that Appellant's waiver of his right to remain silent was knowing, intelligent and voluntary. (*See id.*).

Appellant testified that he is a resident of Detroit and that he would often travel to Erie to spend time with his girlfriend who lives here. (*Id.* at 11-12). He testified that he knew Richard Kemp from his neighborhood in Detroit and that he met Mr. Keefer from his travels to Erie. (*Id.* at 11). He readily admitted to having previously sold drugs in Erie. (*Id.* at 12). He denied,

10

however, ever supplying Richard Kemp with heroin. (*Id.*). He admitted he and Mr. Keefer had purchased drugs together. (*Id.*) He also admitted to having multiple heroin suppliers in Detroit. (*Id.* at 28). He claimed that Richard Kemp would ask for his heroin supplier when Richard's was "unavailable." (*Id.* at 26).

In reference to the transportation of 100 grams of heroin to Erie by Richard Kemp, Appellant acknowledged that he was in Erie on October 24, 2012. (*Id.* at 16). He denied any knowledge of Richard Kemp's possession of 100 grams of heroin in Erie at that time or any attribution to it. (*See id.* at 17).

On cross-examination, Appellant stated he was in Erie on November 9, 2012 to collect a settlement check from an insurance company that was given to his girlfriend for an accident he had in Detroit. (*Id.* at 17-18). He arrived in Erie by train with Jamal Hokes and was picked up by Mr. Keefer. (*Id.* at 20). Appellant denied knowing that Jamal Hokes was carrying heroin. (*Id.* at 21). However, he understood Jamal Hokes was in Erie to sell drugs once Jamal Hokes said there "wasn't no dogs at the train station," in reference to drug-sniffing dogs. (*Id.*). When Mr. Keefer's car was stopped at the Country Fair by Lieutenant Nolan, Appellant denied possession of the heroin found in the car and stated "ain't shit on [*sic*] my bag." (*Id.* at 22).

Appellant further testified that he learned of the heroin seized from the Granada Apartment from the newspaper (*Id.* at 14). He testified that the Granada Apartment was Richard Kemp's apartment that Richard had Mr. Keefer rent. (*Id.*). In summary, Appellant's testimony was that, despite his status as a heroin dealer with multiple suppliers in Detroit, he denied conspiring with Jamal Hokes or Richard Kemp and further denied possession of both the 49.9 grams of heroin in the Lorna Doone cookie box and the 69.1 grams of heroin in the Granada Apartment.

11

Appellant offered no further witnesses and rested. The jury subsequently returned a verdict of guilty on all four counts.

## DISCUSSION

Defendant raises one issue for review on appeal:

> The commonwealth's [*sic*] prosecution of these charges subjected appellant to double jeopardy and violated 18 Pa.C.S.A. 109 and/or 110 in that the defendant was charged at Docket No. 3652-2012 with Possession with Intent to Deliver, Conspiracy and Possession of 49.93 grams in regards to an incident occurring on November 9, 2012. On that same date the police obtained a Search Warrant of an apartment and subsequently charged the defendant with the same charges for the drugs found in the apartment.

(Appellant's Statement of Matters Complained of on Appeal at ¶ 5).

18 Pa.C.S. § 110, known as the compulsory joinder rule, serves a two-fold purpose: "First, it protects a defendant from the governmental harassment of being subjected to successive trials for offenses stemming from the same criminal episode. Secondly, the rule assures finality without unduly burdening the judicial process by repetitious litigation." *Commonwealth v. Gimbara*, 835 A.2d 371, 373-74 (Pa. Super. 2003) (*citing Commonwealth v. Failor*, 770 A.2d 310, 313 (2001)).

Specifically, Section 110 provides, in pertinent part:

> Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:
> 1) The former prosecution resulted in an acquittal or in a conviction as defined in section 109 of this title (relating to when prosecution barred by former prosecution for the same offense) and the subsequent prosecution is for:
>
> . . .
>
> > (ii) any offense based on the same conduct or arising from the same criminal episode, if such offense was known to the appropriate prosecuting officer at the time of the commencement of the first trial and occurred within the same judicial district as the former prosecution unless the court ordered a separate trial of the charge of such offense[.]

12

18 Pa.C.S. § 110(1)(ii).

18 Pa.C.S. § 109 defines a conviction as: "[t]here is a conviction if the prosecution resulted in a judgment of conviction which has not been reversed or vacated, a verdict of guilty which has not been set aside and which is capable of supporting a judgment, or a plea of guilty accepted by the court." 18 Pa.C.S. § 109(3).

The Pennsylvania Supreme Court has developed a four-prong test to determine when Section 110 bars a subsequent prosecution as follows:

> (1) the former prosecution resulted in an acquittal or conviction; (2) the current prosecution was based on the same criminal conduct or arose from the same criminal episode; (3) the prosecutor in the subsequent trial was aware of the charges before the first trial; and (4) all charges [are] within the same judicial district as the former prosecution.

*Commonwealth v. Reid*, 77 A.3d 579, 582 (Pa. 2013) (citing *Commonwealth v. Nolan*, 855 A.2d 834, 839 (Pa. 2004)).

This Court will address each of the four prongs *in seriatim*.


## 1. Appellant's former prosecution resulted in a conviction.

On May 22, 2013, the jury in Appellant's former prosecution at Criminal Docket number 3652 of 2012, involving 49.9 grams of heroin, returned a verdict of guilty on all counts.[5] This would constitute a "conviction" pursuant to 18 Pa.C.S. § 109(3) because there was a guilty verdict and a sentence imposed which has yet to be overturned. *See also Commonwealth ex rel. Trotter v. Hendrick*, 177 A.2d 162, 163-64 (Pa. Super. 1962 ) (holding a conviction occurs when a jury returns a verdict of guilt). Therefore, the first prong is met.

---

[5] On July 31, 2013, Appellant appealed his conviction at Criminal Docket Number 3652 of 2012 to the Superior Court. On July 3, 2014, the Superior Court dismissed the appeal. On July 16, 2014, Appellant's right to appeal was reinstated *nunc pro tunc* and his appeal in his first prosecution is still pending. To date, therefore, Appellant's conviction has not been reversed or vacated.

**2. The current prosecution involving the seizure of 69.1 grams of heroin from the Granada Apartment did not arise from the same criminal episode as the 49.9 grams of heroin seized from a vehicle on the same day.**

For purposes of the second prong of the compulsory joinder rule, joinder is required when the current prosecution involves the same criminal conduct or arises from the same criminal episode. *See Commonwealth v. George*, 38 A.3d 893, 897 (Pa. Super. 2012). A criminal episode has been defined as "an occurrence or connected series of occurrences and developments which may be viewed as distinctive and apart although part of a larger or more comprehensive series." *Id.* (citing *Commonwealth v. Schmidt*, 919 A.2d 241, 246 (Pa.Super. 2007).

In the seminal case of *Commonwealth v. Hude*, 458 A.2d 177 (Pa. 1983), courts were directed to look at the "logical and temporal relationship" between the criminal acts to determine whether they constituted the same "episode." *See id.* at 181. The Pennsylvania Supreme Court explained whether a logical relationship exists by stating: "whether the logical relationship prong of the test is met turns on whether the offenses present a substantial duplication of issues of fact and law. Such a determination depends ultimately on how and what the Commonwealth must prove in the subsequent prosecution." *Id.* at 183. Specifically, the Pennsylvania Supreme Court held that joinder was required when the defendant was tried separately on various possession and delivery charges concerning different quantities of marijuana at different locations but sold to the same victim. 458 A.2d at 494-95.

While guided by *Hude*, this Court is also mindful of our Supreme Court's instructions in *Commonwealth v. Nolan, supra,* wherein the Court cautioned against labeling an "enterprise an episode." 855 A.2d at 840. The Court explained the relationship between a "criminal

14

enterprise" and a "criminal episode" as: "[m]uch like a television sitcom, each week's story has similar characters, producers, and continuity of storyline, but each week is a separate episode – the series of episodes is an enterprise." *Id.* The Court concluded that different criminal episodes within the same criminal enterprise are not required by compulsory joinder to be prosecuted together and may be prosecuted separately. *Id.*

In *Commonwealth v. Reid, supra*, the Pennsylvania Supreme Court also addressed the issue of joinder and unanimously held that joinder was not required. In that case, the defendant was prosecuted twice for selling cocaine. In his first prosecution, he was charged with selling cocaine at a specific location, and in his second prosecution he was charged with conspiring to sell and selling cocaine at various locations before and after the date of the first case. 77 A.3d at 581. Specifically, in 2007, the defendant pled guilty to selling cocaine at a bar parking lot in 2006. *Id.* Subsequently, in 2009, a grand jury implicated the defendant for selling cocaine between 2006 and 2007 at his home and at various bars. *Id.* This did not include the bar parking lot from the 2006 case charged in his first prosecution. *Id.*

The Pennsylvania Supreme Court determined in *Reid* that the defendant's conduct in both prosecutions was not part of the same criminal episode, and further considered whether different evidence was required to establish the offenses charged in each case. *Id.* at 586. The Court compared the witnesses for both cases. *Id.* Although the second prosecution involved the same investigating officer as the first prosecution, the second prosecution also required four additional witnesses. *Id.* The Court also considered the geographic locations of the defendant's conduct in each case. The first prosecution was based on a single act of conduct at a convenience store and in a bar. *Id.* The second prosecution was based on a series of actions that took place in the defendant's home and inside of a different bar. *Id.* The Court further noted that the defendant's

15

actions in the second prosecution sometimes involved a middleman. *Id.* There was no middleman used in the first prosecution. *Id.* Based on the foregoing, the Court concluded there was no substantial duplication of law and fact, and the two prosecutions did not involve the same criminal episode. *Id.*

Applying *Reid* to the facts of the case *sub judice*, this Court concludes that Appellant's conduct prosecuted at Docket Number 3652 of 2012 was not part of the same criminal episode as the conduct prosecuted in the instant case. Looking first to the temporal relationship between Appellant's conduct in both cases, this Court notes that the Criminal Information in both of Appellant's cases charges Appellant with possessing different amounts of heroin on the same date, November 9, 2012. However, the logical relationship between the two offenses must be considered in addition to the temporal relationship. *Reid*, 77 A.3d at 585.

In this case, the logical relationship prong of the compulsory joinder test is not met because there is not a substantial duplication of issues of fact and law between the two cases. This determination is made by inquiring whether different evidence was required to establish the offenses alleged in each case. *Reid*, 77 A.3d at 586. Substantial duplication of law and fact do not exist in cases that "would require the introduction of testimony of completely different police officers and expert witnesses as well as the establishment of separate chains of custody." *Commonwealth v. Bracalielly*, 658 A.2d 755, 762 (Pa. 1995).

Instantly, Appellant's two cases involved some commonality of investigating officers and the same controlled substance, heroin. However, further scrutiny of Appellant's two cases reveals its similarity to the facts of *Reid, supra*. In this case, additional witnesses were required to establish the offenses and these witnesses were not duplicative of the witnesses relied upon in the Appellant's first case. In the instant case, the Commonwealth's main witness was Richard

16

Kemp, who testified as to the details of the conspiracy and how his transportation of 100 grams of heroin to Erie from Detroit on or about October 28, 2012. (*See* N.R. Day One at 45-47). This was over two weeks prior to Appellant's arrival and arrest on November 9, 2012 for possession with intent to distribute 49.9 grams of heroin. Appellant's prosecution at Criminal Docket number 3652 of 2012 involved 49.9 grams of heroin found in the Lorna Doone cookie box discovered in a blue duffel bag found in the truck of a car. Appellant was in the car with Jamal Hokes and Danny Keefer.

The 69.1 grams of heroin at issue in this case was the amount left in the Granada Apartment after Richard Kemp abandoned it. (*See* N.T. Day One at 41-46). The 69.1 grams was the balance of heroin remaining from the original 100 grams brought to Erie from Detroit by Richard Kemp. (*See id.*). Richard Kemp did not testify in Appellant's first prosecution.

A key witness in Appellant's first prosecution was Jamal Hokes, who testified that he and Appellant travelled from Detroit to Erie with 49.9 grams of heroin. Hokes testified that, after their arrest, Appellant agreed to pay Hokes' bond and financially "take care of his family" if Hokes would take the fall for the heroin and admit it was his. (*See* N.T. May 20, 2013 Trial at 32-70). By contrast, Jamal Hokes did not testify in the instant case.

Richard Kemp and Jamal Hokes testified at different trials, involving different amounts of heroin for sale in Erie. They each represented the different chains of custody present in each case. The Commonwealth could only connect possession of the 69.1 grams of heroin in the instant case to Appellant through Richard Kemp. In Appellant's first prosecution, however, the Commonwealth could only connect the possession of the 49.9 grams of heroin in that case to Appellant through Jamal Hokes. There was no evidence that Richard Kemp knew of Appellant's possession with intent to distribute 49.9 grams of heroin found in the car along with Hokes and

17

Keefer on November 9, 2013. The search of the car occurred twelve days after Richard Kemp abandoned the Granada Apartment on October 28, 2013, leaving behind the 69.1 grams of heroin because he feared being arrested. Further, and vice-versa, Jamal Hokes could *not* testify to the 69.1 grams of heroin remaining in the Granada Apartment because that heroin was overseen by Richard Kemp. Therefore, because Appellant's two cases required different evidence to establish separate chains of custody, they did not contain a substantial duplication of fact. *See Bracalielly, supra* at 762. Each case also relied on different witnesses to prove the Commonwealth's case. *See id.*

Additionally, the primary investigating officers in the two cases are different. There was a difference in the investigating officers because there was a jurisdictional difference between the two cases. In the present case, the Granada Apartments are located in Millcreek Township. The search of the car at the Country Fair on November 9, 2012 occurred in the City of Erie. Consequently, two different police agencies were involved in each case. In the instant case, Detective Adam Hardner and Lieutenant Michael Dougan of the Millcreek Township Police department conducted the investigation regarding the heroin found at the Grenada Apartment. Neither officer participated in the investigation of Appellant's first case and neither testified at Appellant's first trial. The location of the drugs in both cases encompassed two different police jurisdictions, Millcreek Township and the City of Erie.

Lieutenant Michael Nolan of the Erie Police Department investigated Appellant's first case and testified in Appellant's first case as an investigating officer. (*See* N.T. May 20, 2013 Trial at 100-09). Lieutenant Nolan also testified in Appellant's second case. However, in the instant case Lieutenant Nolan did not testify as an investigating officer and was, instead, called by the Commonwealth as an expert witness in narcotics. (N.T. Day One at 110). The Court

18

accepted him as an expert witness and his testimony was limited to his expert opinion. (*See id.*). Because Appellant's two cases required the testimony of completely different police officers from two different police jurisdictions and the use of different expert witnesses, they did not contain a substantial duplication of fact. *See Bracalielly, supra* at 762.

There were only two other witnesses in common between the two trials. Detective Jon Reddinger testified in both trials as an investigating officer. However, Detective Reddinger's testimony in the instant case was limited to authenticating a recorded telephone conversation Appellant had while imprisoned. (*See* N.T. Day One at 104-06). Detective Reddinger also authenticated recorded telephone conversations in Appellant's first case. (N.T. May 21, 2013 Trial at 14-20). However, the substance of the telephone conversations, with the exception of one call, was completely different in both cases. In the instant case, one recorded telephone conversation took place November 13, 2012 and consisted of statements made by Appellant to Richard Kemp regarding Appellant's supplier in Detroit. The second conversation involved Appellant and Kemp talking about the police searching the Granada Apartment on November 12, 2012. (*See* Comm.'s Ex. 1).

By contrast, the telephone conversations admitted into evidence in Appellant's first case consisted of calls from Jamal Hokes to his fiancé and sister, and five telephone calls from Appellant on November 10, 11 and 12, 2012 to assorted people. Of these five calls, only the last call, on November 12, 2012 at 1:13 p.m., was admitted into evidence in both cases. Detective Reddinger's testimony in both cases, therefore, was clearly for different purposes and involved different people talking to Appellant for different reasons.

The other witness who testified in both trials was Danny Keefer. There was some overlap in testimony in the course of both trials, but much of that overlap consisted of predicate

facts such as how Appellant and Mr. Keefer knew each other and what tasks Mr. Keefer performed for Appellant. (*See* N.T. Day One at 71-72; *see also* N.T. May 20, 2013 at 75-77). Mr. Keefer acknowledged in both cases that he was a heroin addict who served as a runner for Appellant to sell heroin. Most of Mr. Keefer's testimony in the instant case concerned the apartment and how Appellant's criminal organization operated. (*See* N.T. Day One at 69-76). This included the renting of the Granada Apartment in Keefer's name and use of it as a stash house for the heroin and as a flop house for sellers from Detroit. By contrast, most of Mr. Keefer's testimony in Appellant's first trial concerned the events of November 9, 2012 regarding when Mr. Keefer picked Appellant and Jamal Hokes from the train station and the subsequent search of the vehicle and discovery of 49.9 grams of heroin. (*See* N.T. May 20, 2013 at 70-74). Consequently, Mr. Keefer's testimony in both cases does not represent a substantial duplication of fact.

The remaining evidence admitted to establish the offenses in each case was also completely different. Appellant's first case involved 49.9 grams of heroin found in Mr. Keefer's car with Appellant as a passenger on November 9, 2012. Aside from witness testimony, including Danny Keefer's, the other pieces of evidence admitted to establish Appellant's offenses in the first case included: a Lorna Doone box (which contained the heroin); a bag containing the 49.9 grams of heroin; a video of Appellant and Jamal Hokes arriving from the Erie train station; a photograph of Mr. Keefer's trunk; a copy of Jamal Hokes' statement to police; the lab report testing the 49.9 grams of heroin; the expert testimony of Detective Greg Acri and his report; and the recorded telephone calls of Appellant and Jamal Hokes. (*See* Crim. Docket 3652-2012, Comm.'s Exs. 1-9).

20

By contrast, the instant case involved criminal conspiracy to possess with intent to distribute and possession with intent to distribute 69.1 grams of heroin found in the Granada Apartment on November 9, 2012. This amount of heroin represented a part of 100 grams of heroin brought to Erie from Detroit four to five days prior to October 28, 2012 by Richard Kemp. The evidence admitted to establish Appellant's offense in this case included witness testimony and: the recorded telephone calls of Appellant; photographs of the Granada Apartment; the 69.1 grams of heroin at issue in this case; the U.S. Balance digital scale found in the Granada Apartment; the A.W.S. 100 digital scale found in the Granada Apartment; plastic baggies found in the Granada Apartment; the recorded property report from the search of the Granada Apartment; the lab report testing the 69.1 grams of heroin at issue in this case; the fingerprint examination report from the fingerprints lifted from the Granada Apartment; and Lieutenant Nolan's expert report. (Comm.'s Exs. 1-13). The only piece of evidence that was the same in both cases was the recorded telephone conversation of Appellant on November 12, 2012 at 1:13 p.m. Noting the difference in witnesses called by the Commonwealth in each case and the different exhibits admitted into evidence in each case, this solitary piece of evidence regarding the same phone call does not represent a substantial duplication of fact.

The Court also notes the conspiracies as charged in both cases were different. In the instant case, Appellant was charged specifically with conspiring with Richard Kemp in regard to the 69.1 grams of heroin at the Granada Apartment. (*See* September 25, 2013 Criminal Information at Count 2). Richard Kemp's testimony was offered to prove that a conspiratorial relationship existed. In Appellant's first prosecution, however, the conspiracy centered around Appellant's relationship with Jamal Hokes to transport 49.9 grams of heroin from Detroit to Erie on November 9, 2012. Jamal Hokes' testimony in the first trial was offered to prove that specific

21

conspiratorial relationship. This further illustrates that the 49.9 grams of heroin Appellant conspired to bring to Erie with Jamal Hokes in his first prosecution was separate and apart from the 100 grams of heroin Appellant conspired to bring to Erie with Richard Kemp. Additionally, Appellant's own testimony established that he used multiple sources in Detroit. (N.T. Day Two at 28). Richard Kemp also indicated he utilized multiple sources from Detroit, including Appellant, to supply him with heroin. It is, therefore, possible that the 100 grams of heroin brought to Erie from Detroit by Richard Kemp came from a separate source from the 49.9 grams brought to Erie from Detroit by Appellant and Jamal Hokes. Consequently, this case involved multiple suppliers of heroin in separate conspiracies dealing with separate amounts of heroin brought to Erie from Detroit on different days.

Based on the foregoing, Appellant's first prosecution and the instant case required proof of different facts through the testimony of different witnesses as a basis of their admissibility. Thus, because different evidence was required to establish the offenses in each case, there was no substantial duplication of issues of fact or law between the two cases. *See Reid, supra* at 586.

Finally, assuming *arguendo* that Appellant's actions in his first prosecution and the instant case could be characterized as part of the same criminal enterprise, they represented separate criminal episodes. Pursuant to *Nolan, supra*, different criminal episodes within the same criminal enterprise are not required to be prosecuted together under the compulsory joinder rule. *Id.* at 840. As set forth above, Appellant's first prosecution and the instant case constituted separate criminal episodes. Therefore, for all of the reasons set forth above, the second prong of the compulsory joinder analysis is not met.

22

**3) The prosecutor in the instant case was unaware of Appellant's charges before the first trial.**

Next, joinder is inappropriate in this case because the prosecutor was not aware of

Appellant's conduct and joint possession of 69.1 grams of heroin until *after* his conviction in the

previous case. According to the representation of Assistant District Attorney Panighetti, at the

time of the execution of the search warrant on the Granada Apartment on November 9, 2012, the

Commonwealth had no additional evidence regarding who was responsible for possessing the

heroin at the Granada Apartment. (*See* N.T. Day One at 9-10). Assistant District Attorney Justin

Panighetti explained as follows:

> Mr. Panighetti: [T]he initial charges involve [Appellant] and a co-defendant under the name of Jamal Hokes. In that instance Jamal – it was within Jamel's bags that drugs were found. It was 49.9 grams was what the last case involved and –
> The Court: What was the drug?
> Mr. Panighetti: Heroin.
> The Court: Okay.
> Mr. Panighetti: Heroin. And so at that time Mr. Hokes became a witness, a witness for the Commonwealth very shortly thereafter and testified with regards to those drugs. There was another individual who was in the car. There was an individual name[d] Danny Keefer, who will testify today, who rented this apartment that we're talking about. That individual was the one that was inside the car with him. He had picked them up from the train station. It was in his car that they were in when they were at Country Fair and he had indicated that, yes, he had rented the apartment at that time, but he could not speak to – because we went back. We did get the search warrant based on him saying that he believed there might be, there was probably heroin in this apartment. He could not say – he could not tie this heroin to Mr. Seaton and Mr. Hokes could not tie it to Mr. Seaton because they would rotate. A different person would come in and sell the drugs each week, okay? And so it wasn't until we got fingerprints back on Richard Kemp and this happened after his trial.

(*Id.*).

According to the Commonwealth, neither Appellant nor Jamal Hokes could be connected

to the 69.9 grams of heroin in this case because the co-conspirators would frequently rotate in

delivering the heroin to Erie. (*See id.*). It was not until fingerprint results were returned from the

evidence extracted from the apartment that the Commonwealth could connect the heroin to Richard Kemp and, ultimately, Appellant. (*See id.*). Richard Kemp was subsequently arrested on June 20, 2013, a full month after Appellant's first trial. (*Id.* at 37). Richard Kemp then agreed to inform the Commonwealth about Appellant's involvement in the conspiracy. (*Id.* at 37-38).

A review of the trial transcript from Appellant's first prosecution reveals that the Commonwealth was, in fact, aware of Appellant's role as the leader of the drug conspiracy that operated out of the Granada Apartment. However, as explained *supra*, the instant case and Appellant's first case involved separate chains of custody because Richard Kemp and Jamal Hokes were mutually exclusive of each other. Consequently, the Commonwealth could not prosecute Appellant in the instant action until it could establish the chain of custody linking Appellant to the 69.1 grams of heroin found in the Granada Apartment. This could only be done through the testimony of Richard Kemp. Richard Kemp was not arrested until June 20, 2013, one month after Appellant's first trial for the 49.9 grams of heroin. Therefore, for purposes of the third prong of the compulsory joinder rule, the prosecutor in the instant case was not aware of Appellant's current charges relating to the 69.1 grams of heroin prior to Appellant's first trial for the 49.9 grams of heroin.

## 4) Appellant's instant charges are within the same judicial district as the former prosecution.

Analysis of the fourth factor is not necessary because, as demonstrated above, two prior requirements to establish compulsory joinder have not been met. The Court notes, however, that Appellant's first case was also prosecuted within the Court of Common Pleas of Erie County, Pennsylvania.

24

Therefore, the Court concedes that the first and fourth elements required for compulsory joinder have been satisfied. *See Reid, supra.* However, all four elements must be present to mandate joinder and, as illustrated above, two elements are not satisfied.

First, the current prosecution was not based on the same criminal episode as the former prosecution. Both cases involved different chains of custody, different witnesses, and different evidence and exhibits. Even if these two matters were considered part of a criminal enterprise, they were each separate criminal episodes, and joinder was not mandated. *See Nolan, supra.* Notably, if these two matters were joined, Appellant's defense would have focused on the existence of multiple conspiracies and not one centralized agreement to distribute heroin. This was his defense in the current case. Appellant conceded he was a heroin dealer but was not involved in the current conspiracy with Richard Kemp to distribute heroin in Erie. This again reaffirms that joinder was not mandated. This was also consistent with Appellant's assertion that he had multiple sources of heroin available to him in Detroit, as did Richard Kemp.

Second, the prosecutor was not aware of Appellant's current charges regarding the 69.1 grams of heroin prior to the first trial for the 49.9 grams of heroin.

Further, because Appellant's conduct in both cases constitutes different criminal episodes, Appellant's constitutional protections against double jeopardy have also been protected. *See Commonwealth v. Schmidt*, 919 A.2d 241, 251 (Pa.Super. 2007) (holding that two separate criminal episodes do not constitute the same offense within the meaning of the double jeopardy clauses). Consequently, Appellant was never prosecuted twice for the same offense.

Thus, Appellant's sole issue and challenge to his conviction and sentence is devoid of factual or legal merit and must thereby be dismissed.

25

## CONCLUSION

For the reasons set forth above, Appellant's appeal should be dismissed.

BY THE COURT:

John J. Trucilla, Administrative Judge

cc:    Office of the District Attorney
       Wayne G. Johnson, Jr., Esquire